IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ALI YEDES, | ) | CASE NO.  1: 11 CV 465 |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| v. | ) | |
| | ) | MEMORANDUM OPINION |
| OBERLIN COLLEGE, et al., | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the Court on the Motion of Defendants Oberlin College ("Oberlin")

and Matthew Senior for Summary Judgment. (ECF #18).  For the reasons that follow,

Defendants' Motion for Summary Judgment is granted AS.

**FACTUAL BACKGROUND**[1]

Plaintiff Ali Yedes, brings this Title VII action against his employer Oberlin College and

Matthew Senior, who is an employee of Oberlin College and was the Chair of the French

Department during the time period at issue. (Complaint, ¶¶ 1-8, 14) Specifically, Plaintiff alleges

that Defendants have discriminated against him during the course of his employment with

Oberlin on the basis of his race, national origin and religion in violation of Title VII of the Civil

Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*[2] Plaintiff states that he is a Muslim,

of Arab descent and Tunisian national origin. (Complaint, ¶¶10-11, 20). The Complaint appears

---

[1]

The factual summary is based upon the parties' statements of fact.  Those material facts that are
controverted and supported by deposition testimony, affidavit, or other evidence are stated in the light most
favorable to the non-moving party.

[2]

Plaintiff's EEOC Complaint also alleges age discrimination which Plaintiff has apparently declined to
pursue in this litigation.

to assert the following claims under Title VII: that Plaintiff was treated disparately from similarly situated non-Arab, non- Muslim co-workers; that he was subjected to a hostile work environment because of his race, religion and national origin; that Defendants failed to promote Plaintiff due to his national origin, religion and race; that Defendants retaliated against him for engaging in protected activity.  The Complaint also contains references to state law claims of intentional infliction of serious emotional distress; negligent retention of Mr. Senior and negligent supervision of Mr. Senior.

Plaintiff was hired by Oberlin in 2000 as a non-tenured assistant professor of French for a term of four years starting at an annual base salary of $50,000. (Yedes Dep. Ex. 1; Complaint, ¶9). Mr. Yedes received a raise every year during his four year term, as well as highly favorable reviews on his progress toward tenure. (Declaration of Sandhya Subramanian, ECF #18 at Ex. C). In January, 2006, Plaintiff and a junior colleague, Assistant Professor Grace An were involved in a confrontation involving raised voices.  Apparently Ms. An felt threatened and filed a complaint with the Dean of the College of Arts and Sciences, Harry Hirsch. (Declaration of Grace An, ECF #18, Ex. D) Dean Hirsh spoke with Mr. Yedes and Ms. An and the Department Chair at the time, Janice Zinser concerning the incident. Dean Hirsh wrote a letter to Mr. Yedes on February 14, 2006, following up on his conversations with Plaintiff and Ms. An.  He acknowledged that Plaintiff had received upsetting personal news earlier in the day of his confrontation with Ms. An  and noted that Plaintiff had acknowledged that he made a mistake in confronting Ms. An and that his behavior during that confrontation was inappropriate. Dean Hirsh extended his thanks to Plaintiff for his acknowledgment of his error and his quick written apology to Ms. An. As a result of the incident, the Dean ordered that Plaintiff not be involved in

2

any personnel review of Ms. An's performance as a member of the French department until further notice. (ECF #18, Ex. E, Declaration of Harry Hirsh, Ex. 1)

Also in February, 2006, the College Faculty Council voted  Plaintiff to the Middle Eastern/North African Curricular Committee. ("MENA") (ECF #18, Hirsh Decl., Ex. 2) In March 2006, Oberlin awarded Plaintiff tenure and a promotion to the rank of Associate Professor of French, effective July 1, 2006. ((ECF #18, Ex. C, Subramanian Decl., Ex.12) Plaintiff's grant of tenure and promotion to Associate Professor was supported by his colleagues in the Department of French and Italian, the Dean of the College, the College Faculty Council and President Nancy Dye. (Id.) Since he was awarded tenure, Oberlin has given Plaintiff continuous salary increases and granted him a fully paid sabbatical for the first semester and winter term of the 2006-2007 academic year.

Plaintiff is the advisor for the Oberlin Muslim Student Association, ensures there is Jummah Prayer, delivers the Khutbah, the sermon, and works with Rabbi Brand at Kosher Halal Co-op. Plaintiff participates every Friday night with the Jewish Shabbat with Rabbi Brand. Rabbi Brand, the Jewish Chaplain of Oberlin and the Office of Religious and Spiritual Life, noted that he works with Mr. Yeddes in facilitating "an atmosphere where both Jewish and Muslim students, plus other students, can feel safe in expressing and celebrating their sense of their own religious identity." (Brand Dep. 8-9)

In 2006, the French Department concluded a multi-year search for a senior level professor who could also serve as chair of the Department since Janice Zinser, the chair of the Department and the other senior member of the Department Nelson de Jesus, planned to retire. On April 23, 2006, Ms. Zinser forwarded a Memorandum to Dean Hirsh recommending the

appointment of Matthew Senior as a full professor with tenure. The Memorandum states that the recommendation is made with the unanimous and enthusiastic support of the continuing members of the department including Plaintiff. (ECF #18, Ex. G-1, Declaration of Janice Zinser). Mr. Senior began his employment with Oberlin as Associate Professor of French with tenure, and chair of the French and Italian Department on July 1, 2007. (ECF #18, Ex. C Subramanian Decl., Ex. 15).

While Plaintiff alleges that he struggled from early on in his time at Oberlin to have Oberlin accommodate his religious beliefs and respect his role as Imam and religious advisor to Oberlin's student Muslim community, it was only when Mr. Senior was hired and assumed the Chair of the French Department that Plaintiff was subjected to the worst and escalating hostile work environment. (Yedes Dep. 29-30).[3]  In his Complaint Plaintiff states that Mr. Senior made many discriminatory comments to him, including but not limited to, the following:

      a.  I would not persecute you like this if you were American'

      b.  Oh, you are a Holy man, what do you say, what do you say, in your preaching?;

      c.  So, you are a Holy man, what do you do when you lead the prayer?;

      d.  I was hired to protect Grace and Libby from you;

      e.  You are a terrorist;

      f.  I've been hired to protect all the female employees from you;

      g.  I know how to deal with you North Africans.

---

[3]

With respect to the pre-Senior days, Plaintiff alleges that former Chair Ms. Zinser and the French Department would not accommodate his need for time on Friday to prepare for his Friday services, noting that forming Jummah prayer and preparing a sermon does not take any time or have much value. Plaintiff states that Ms. Zinser told him that his religion was "his business."

4

(Complaint, ¶ 25).  Plaintiff has failed to give the dates on which these statements were allegedly made.  Plaintiff also included in his Opposition to Summary Judgment, a time line of statements or confrontations between Plaintiff and Mr. Senior ranging from January 1, 2009 to 2011.  Once again, however, the dates are given in ranges and most of the statements are from Plaintiff to Mr. Senior complaining about Senior's racism or conduct toward Plaintiff.

Plaintiff contends that he was promised  tenure in five years instead of six if he produced a book.  Plaintiff asserts that he produced a book but did not receive tenure early.  (Yedes Dep. 135-140) In contrast, Plaintiff asserts that Sebastian Faber, in Hispanic studies, was put up early for tenure. (An Dep. At 43-44).  Further, Plaintiff states that he "was to be chair right after tenure, not newly hired Defendant Senior in 2006. (ECF #35, Yedes Dep. 143-44, 150). Plaintiff also complains in his opposition to summary judgment that he was "scrutinized and subjected to hostile comments and even reports to the college that he was "unprofessional" and hostile, [while] his French coworker Thommert was given shocking latitude." Plaintiff notes that Thommert made sexual innuendos and remarks to female students and there were complaints of sexual harassment, but he was still reappointed by Mr. Senior for two years. (ECF #35 at 6)

All parties refer to a French Department meeting in February 2009, attended by Mr. Senior, Plaintiff, Grace An, Libby Murphy and Loic Thommeret in which there was a heated argument between Mr. Senior and Plaintiff regarding whether Mr. Thommeret should teach a 400 level course. (ECF #18, Senior Decl. Ex.1) Mr Senior claimed that by the end of the meeting everyone who attended felt unsafe because of Plaintiff's behavior. (Id.)

Shortly thereafter, on March 4, 2009, Plaintiff sent an email to Dean Sean Decatur complaining about Mr. Senior's alleged discriminatory conduct and requesting the Dean's

5

assistance "to resolve what has become a long and sustained pattern of workplace harassment of me by my colleague, Matthew Senior. Since the time of his arrival to Oberlin, he has created an extremely hostile work environment for me, and tried to alienate me from other members of the department." (ECF #35, Ex. 4, Pl's Dep. Ex. 1).[4]  Defendants state that in response to this email, Dean Decatur arranged for a professional mediator to assist with the dispute between Plaintiff and Mr. Senior. The Mediator purportedly interviewed members of the French Department and determined that the matter was not appropriate for mediation.(ECF #18 at 7 and citations listed). After the mediation attempt fizzled, Dean Decatur states that he informed both Plaintiff and Mr. Senior that they could file a complaint with the Professional Conduct Review Committee ("PCRC"). (Decatur Dep. 89-94, ECF #18, Ex. J) Mr. Senior filed a complaint on May 13, 2009. Mr. Yedes was informed of the complaint on May 13, 3009 and was given 5 days to file a response.  Mr. Yedes filed a response but did not file his own complaint against Mr. Senior.  An investigative panel of the PCRC was convened on May 14, 2009 and issued a report on June 2, 2009.  The panel reviewed the complaint, parts of the mediator's report, Appendix H of the Faculty Handbook, and conducted one hour interviews with Mr. Senior and Plaintiff and met with Dean Decatur.  As a result of their investigation, the panel decided unanimously that none of the behaviors listed in Mr. Senior's complaint could be construed as professional misconduct. It was the panel's considered opinion that:

---

[4]

Defendants claim that this was the first complaint that Plaintiff made about Mr. Senior's alleged harassment.  However, in his timeline, Plaintiff contends that he also complained verbally to Dean Decator on two occasions several months before the March 4 email complaint. The conversations informed the Dean that he felt he was being intimidated and discriminated against by both Mr. Senior and Professor Schiff with respect to the MENA Committee. (ECF #35, Ex. 1 citing Yedes Dep. 93-96). Plaintiff also contends that during the primary events relative to his discrimination claims, there was significant turnover in the Dean's office, three deans in four years. Plaintiff claims to have made a number of verbal complaints to former Acting Dean Witmer.( See ECF #35 and citations therein.)

> [T]he French Department has, as a result of years of miscommunication, staffing pattern changes, and conflict, become dysfunctional–to the point where basic department business cannot be conducted without the presence of neutral third party.  We do not attribute the dysfunction to only one person's words or actions; rather, there appears to be a very complex mix of factors and events.  Resolving the dispute between the parties by penalizing one or the other will not improve the current situation which has reached an unsustainable level of tension within the department.  The panel's recommendation is that Dean Decatur should craft a productive, forward-looking, non-punitive solution to this unfortunate state of affairs–to be in place before Fall 2009.

(ECF #18, Subramanian Decl., Ex 16 at p. 1) The panel specifically noted that it was not tasked to pursue Plaintiff's claim of racism, but pointed out that "a charge of racism is a serious matter which should be addressed with care and gravity." (Id. at p. 3)

Plaintiff asserts that Dean Decatur did not "craft a solution" to the ongoing problems in the French Department before Fall 2009 and further complains that his claims of discrimination were never addressed or considered. Accordingly, Plaintiff filed a charge with the EEOC on October 30, 2009 alleging continuing discrimination based on race, national origin, religion and age from 2003.

## STANDARD OF REVIEW

Summary judgment is appropriate when the court is satisfied "that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  The burden of showing the absence of any such "genuine dispute" rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine [dispute] of material fact.

7

*Celotex v. Catrett*, 477 U.S. 317, 323 (1986) (citing FED. R. CIV. P. 56(c)).  A fact is "material" only if its resolution will affect the outcome of the lawsuit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Determination of whether a dispute is "genuine" requires consideration of the applicable evidentiary standards.  The court will view the summary judgment motion in the light most favorable to the party opposing the motion.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  In sum, proper summary judgment analysis entails "the threshold inquiry of determining whether there is the need for a trial--whether, in other words, there are any genuine factual [disputes] that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  *Anderson*, 477 U.S. at 250.

### DISCUSSION

Plaintiff asserts race, national origin and religious discrimination, hostile work environment and retaliation claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended. Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]"  42 U.S.C. § 2000e-2(a)(1). Defendants raise the following arguments in their summary judgment papers: (A) the claims against Mr. Senior must fail because Title VII does not provide for supervisor liability; (B) Plaintiff's disparate treatment and hostile work environment claims are barred by the statute of limitations; (C) Plaintiff fails to state a prima facie case for his discrimination claims or to provide evidence of direct discrimination relating to his disparate treatment claims; (D) Even if not time barred, Plaintiff's hostile work environment claim fails; (E) Defendants are entitled to summary judgment on Plaintiff's retaliation claim; (F) Defendants are entitled to

8

summary judgment on Plaintiff's Intentional Infliction of Emotional Distress claim; and (G) Plaintiff's Negligent Retention and Supervision claims fail as a matter of law. These arguments will be addressed in order.

### A.  Mr. Senior's liability under Title VII

The law is clear in the Sixth Circuit that an individual employee, who does not qualify as an employer within the meaning of Title VII, may not be held personally liable under Title VII. *Wathen v. General Electric Co.*, 115 F.3d 400, 405 (6th Cir. 1997). In his Opposition brief, Plaintiff concedes that Mr. Senior is not individually liable for his conduct under Title VII, but states, without authority or support, that Mr. Senior remains an individual defendant for the retaliation claim. However, Plaintiff's retaliation claim is brought under Title VII and does not survive the bar against individual liability recognized in *Wathen*. Accordingly, Defendant Senior's Motion for Summary Judgment on all of Plaintiff's claims under Title VII is granted.

### B. Statute of Limitations

Oberlin contends that Plaintiff's disparate treatment and hostile work environment claims are barred by the statute of limitations.  All parties agree that it is well settled that "[a] claim under Title VII is timely if filed within 300 days of any single [discriminatory] act . . . ." *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 511 (6th Cir. 2009) (citing 42 U.S.C. § 2000e-5(e)(1); *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2009)).  Plaintiff filed his EEOC claim on October 30, 2009, thus he must claim at least one discriminatory act occurred after January 2, 2009. In this case, Plaintiff contends that the continuing violation theory applies in this case and that the doctrine creates an exception to the 300 day limitation when the unlawful behavior is deemed ongoing. See *Roberts v. North American Rockwell Corp.*, 650 F.2d 823 (6th Cir. 1980);

9

*McFarland v. Henderson*, 307 F.3d 402 (6th Cirl 2002). While Oblerlin acknowledges the existence of the continuing violation theory with respect to hostile work environment claims, it contends that the theory does not apply to disparate treatment or retaliation claims. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 (2002) ("We conclude that a Title VII plaintiff raising claims of discrete discriminatory or retaliatory acts must file his charge within . . . 300 days.")

Moving first to Plaintiff's claim that Oberlin failed to promote him because of his race, religion or national origin, the basis for the claim appears to be that Oberlin delayed his tenure review for one year. (Yedes Dep. 135, 143). Plaintiff was awarded tenure in March 2006. Plaintiff also asserted in his deposition that he was denied the chair of the French Department, stating that "I was supposed to be chair, not Matt Senior." (Yedes Dep 143). Oberlin hired Mr. Senior in 2006 and he began his employment and position as chair of the department in July 2007. Mr. Yedes agreed that Oberlin had not denied him any other positions or titles other than the chair position in 2007.  (Yedes Dep. 172).  As these events (2006 tenure decision and 2007 chair decision) forming the basis of the claim occurred years before the 300 day period, Plaintiff's failure to promote claim is time barred.

Plaintiff's hostile work environment claim is subject to the continuing violation doctrine. Nevertheless, Oberlin contends that the claim is still time barred because the conduct relied on by Plaintiff occurred before the 300 day period, not after the period. Further, Oberlin contends that the events that Plaintiff asserts occurred within the 300 day period or thereafter, represent remarks made by Plaintiff, not Oberlin and that the remainder are either not part of the alleged hostile work environment or are not in the same universe of severe conduct required to establish

10

a hostile work environment claim. It is difficult to determine when exactly the events Plaintiff

complains of, such as being dropped from the department email distribution list, excluded from

other departmental activities and meetings and decisions, occurred.  It appears that this was an

ongoing problem and that such things occurred during the 300 day period.  Whether these things

amount to a basis for a hostile work environment claim will be discussed when the claim is

addressed on its merits. At this point however, the Court cannot accept Oberlin's contention that

Plaintiff's hostile work environment claim is time barred.

### C. Plaintiff's Disparate Treatment Claim

Even if Plaintiff's disparate treatment claim were not time barred, Oberlin asserts that

Plaintiff has failed to assert a prima facie case of disparate treatment or to show any direct

evidence to support such a claim.

Title VII prohibits employers from discriminating against employees on the basis of race,

national origin or religion.  42 U.S.C. § 2000e.  "It is well established that the burden is on an

employment discrimination plaintiff to establish a *prima facie* case of discrimination." *Mitchell*

*v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (citations omitted).  A plaintiff may establish

a claim of disparate treatment in one of two ways--via indirect or direct evidence.  First, a

plaintiff may establish a *prima facie* case of discrimination by showing that (1) he was a member

of a protected class; (2) he suffered an adverse employment action; (3) he was qualified for the

position; and, (4) he was replaced by a person outside the class.  *Id; Talley v. Bravo Pitino*

*Restaurant, Ltd.*, 61 F.3d 1241, 1246 (6th Cir. 1995).  If a plaintiff's claim is that a similarly

situated non-minority was treated more favorably, the fourth prong of the test is altered, *i.e.*, "a

plaintiff can also make out a prima facie case by showing, in addition to the first three elements,

that 'a comparable non-protected person was treated better'."  *Mitchell*, 964 F.2d at 582; *Talley*,

61 F.3d at 1246.  Second, a plaintiff may alternatively establish her case "by presenting credible,

direct evidence of discriminatory intent."  *Mitchell*, 964 F.2d at 582 n.4. Direct evidence is

> "that evidence which, if believed, requires the conclusion that
> unlawful discrimination was at least a motivating factor in the
> employer's actions". *Jacklyn v. Schering-Plough Healthcare
> Prods. Sales Corp*., 176 F.3d 921, 926 (6ᵗʰ Cir. 1999). "Consistent
> with this definition, direct evidence of discrimination does not
> require a factfinder to draw any inferences in order to conclude
> that the challenged employment action was motivated at least in
> part by prejudice against members of the protected group."
> *Johnson v. Kroger Co.,* 319 F.3d 858, 865 (6th Cir.2003).
> The direct evidence must prove "not only that the plaintiff's
> employer was predisposed to discriminate on the basis of [race,
> national origin or religion], but also that the employer acted on the
> predisposition. *Hein v. All America Playwood Co. v. All America
> Plywood Co.*, 232 F.3d 482, 488 (6ᵗʰ Cir. 2000). Finally, "an
> employee who has presented direct evidence of improper motive
> does not bear the burden of disproving other possible
> nonretaliatory reasons for the adverse action. Rather, the burden
> shifts to the employer to prove by a preponderance of the evidence
> that it would have made the same decision absent the
> impermissible motive." *Weigel v. Baptist Hosp. of E. Tenn.,* 302
> F.3d 367, 382 (6th Cir.2002).

 *DiCarlo v. Potter*, 358 F.3d 408, 415 (6ᵗʰ Cir. 2004)

In the absence of direct evidence, the court applies the familiar burden-shifting approach

for inferential proof of discrimination set forth in *Texas Dept. of Community Affairs v. Burdine*,

450 U.S. 248 (1981) and *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  While the

burden of persuasion remains with the plaintiff, the burden of production shifts between the

parties.  The Sixth Circuit has described this approach as follows: "(1) the plaintiff must

establish a prima facie case of discrimination; (2) the employer must articulate some legitimate,

nondiscriminatory reason for its actions; and (3) the plaintiff must prove that the stated reason

12

was in fact pretextual." *Harrison v. Metropolitan Gov't of Nashville and Davidson County*, 80

F.3d 1107, 1115 (6th Cir. 1996).  In establishing pretext, the plaintiff "may succeed . . . either

directly by persuading the court that a discriminatory reason more likely motivated the employer

or indirectly by showing that the employer's proffered explanation is unworthy of credence."

*Burdine*, 450 U.S. at 256.  "An employee can show pretext by offering evidence that the

employer's proffered reason had no basis in fact, did not actually motivate its decision, or was

never used in the past to discharge an employee." *Smith v. Chrysler Corp.*, 155 F.3d 799, 805-

06 (6th Cir. 1998).  "In order to prove pretext, therefore, the plaintiff must introduce admissible

evidence to show that the proffered reason was not the true reason for the employment decision

and that discriminatory animus was the true motivation driving the employer's determination."

*Grace v. USCAR*, 521 F.3d 655, 677-78 (6th Cir. 2008).  "An employer may make employment

decisions 'for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at

all, as long as its action is not for a discriminatory reason.'" *Brown v. Renter's Choice, Inc.*, 55

F. Supp. 2d 788, 795 (N.D. Ohio 1999) (quoting *Nix v. WLCY Radio/Rahall Communications*,

738 F.2d 1181, 1187 (11th Cir. 1984)).

Plaintiff asserts that he can establish his disparate treatment claim through both direct

and circumstantial evidence. In both cases, the adverse actions (or the instances where he was

discriminated against) are  that he allegedly suffered a one year delay in obtaining tenure and

was not promoted to Chair of the French and Italian Department in 2007 instead of Mr. Senior.

Moving first the to the circumstantial evidence and the McDonnell Douglas burden shifting

analysis, Oberlin asserts that Plaintiff does not establish a prima facie case of discrimination

with respect to his delayed tenure claim because under the language of the Faculty Guide, he

13

was not eligible for tenure prior to the time that Oberlin awarded it to him. Specifically, Oberlin asserts that under the Faculty Guide, granting of tenure may be considered in a Faculty member's sixth year of service, except in cases where special negotiations have been made with the Dean and set forth in writing. Further, the Faculty Guide states that any amount of prior service that is to be counted toward tenure will be negotiated between the Dean and the prospective faculty member and be specified in writing in the letter of initial appointment. (ECF #18, Ex. C, Subramanian Decl., Ex. 20 at 17). In his deposition, Plaintiff states that he made an agreement with Associate Dean Bob Geitz to have his prior year of teaching experience at another college included in his tenure eligibility calculation and that the agreement was not in writing. (Yedes Dep. 136) Further, Plaintiff's initial appointment letter does not contain this agreement and in fact states that Plaintiff would be considered for tenure during the academic year 2005-06. Plaintiff accepted this offer in writing. Thus, under the Faculty Guide, Plaintiff was not eligible for tenure during the 2004-05 academic year. Plaintiff's brief in opposition does not address this eligibility argument regarding the alleged delay of tenure. Even if the court determined that Plaintiff was eligible for tenure a year early and that Plaintiff otherwise met his prima facie case, Oberlin's grant of tenure in academic year 2005-06 based upon the Faculty guide would constitute a legitimate, non-discriminatory reason for its action. Plaintiff has made no attempt to show that Oberlin's timing of its tenure decision was a pretext for discrimination. The court finds that Plaintiff has failed to make his prima facie case based upon the alleged delay in tenure, and in addition that Plaintiff has made no showing that Oberlin's stated reason for the alleged delay in granting him tenure was a pretext for discrimination.

　　　　Similarly, Oberlin argues that Plaintiff's claim that Oberlin discriminated against him by

failing to promote him to chair in 2006-2007 fails because Plaintiff was not qualified to be chair at that time. Oberlin conducted a search for a chair of the French Department for two years prior to hiring Mr. Senior in 2006.  The search for a senior professor was necessary because the only tenured professors in the department were retiring and the remaining members were untenured and could not be chair. Indeed, Mr. Yedes participated in the search for a chair and supported extending an offer to Mr. Senior for the chair position. At the time that Mr. Senior was hired he had seven years experience in the role of chair and 23 years of teaching experience. Mr. Yedes had 0 years of experience as chair and 8 years of teaching experience. Mr. Yedes rebuts that he was granted tenure in March 2006, shortly before Mr. Senior was hired.  He contends that "he was to be chair right after tenure, not newly hired Senior in 2006." (ECF #35 at 20.) Plaintiff states that he told former chair Ms. Zinser that it would be better for the French Department if the chair knew Oberlin and believed that it would be cheaper and easier for the college to hire an assistant professor and have himself as chair. Id. Plaintiff further states that former Chair Zinser told Dean Hirsh that Mr. Yedes should not be chair and told Plaintiff that he would never be chair. Even if the Court agrees that Plaintiff was belatedly qualified for the chair position, if achieving tenure were the only qualification, Oberlin's stated reasons for searching for a more senior professor to be chair are legitimate, non-discriminatory reasons for its hiring and appointment of Mr. Senior as Chair. Moreover, Plaintiff's argument that if he had been granted tenure early and thus would have been eligible for chair at the beginning of the search for a senior professor is circular.  Plaintiff has not offered any evidence that Oberlin delayed his tenure decision because of a discriminatory reason or that he was not appointed chair in 2007 because of a discriminatory reason.  Even if former Chair Zinser recommended that Plaintiff not

15

be chair and told Plaintiff that he would never be chair, such statements do not reflect her reasoning in purportedly thinking that Plaintiff should not be chair. There is no evidence that any such statements reflect race, national origin or religious discrimination as a reason for her position.  The court finds that Plaintiff has failed to make his prima facie case based upon the failure to promote him to Chair in 2007, and in addition that Plaintiff has made no showing that Oberlin's stated reasons for not promoting him to Chair in 2007 were a pretext for discrimination.  Accordingly, Plaintiff's disparate treatment claim based upon the tenure decision and the failure to promote to chair fail on their merits.

   With respect to a direct evidence analysis, Oberlin asserts that there is no direct evidence of discrimination.  Plaintiff points to the statements allegedly made by Mr. Senior set forth in his Complaint. Even if all of the statements were actually made and actually were discriminatory on their face, all of the statements were made after the adverse actions occurred. Moreover, Mr. Senior had no part in the tenure or chair decisions. While Plaintiff notes that former Chair Zinser allegedly told him that his religion was his business and that he should change your Friday prayer to Saturday or Sunday. These statements, if true, may be offensive to Plaintiff and reflect a dismissive attitude toward Plaintiff's religion, but do not show that Ms. Zinser or Oberlin were predisposed to discriminate against Plaintiff on the basis of race, national origin or religion, and also that Oberlin acted on such predisposition.  As Chair, Ms. Zinser recommended Plaintiff for tenure and recommended that Oberlin hire Mr. Senior to take over as Chair after she retired. While Plaintiff states that Ms. Zinser told him he would never be chair, that statement reflects only that Ms. Zinser thought he should not be chair, not that he should not be chair because of his race, national origin or religion.  In any event, even if the court found that Plaintiff sustained

16

his burden of providing direct evidence that Ms. Zinser (and thus Oberlin) was predisposed to discriminate against Plaintiff and acted in accordance with that predisposition, Oberlin has clearly met its burden of showing by a preponderance of the evidence that it would have made the same tenure and chair decisions in 2006 and 2007 absent the impermissible motive.

In his opposition brief Plaintiff separates his disparate treatment claim into one based on race and national origin and another based on his religion. Plaintiff notes that in order to demonstrate a prima facie case of religious discrimination he must show (1) that he holds a sincere religious belief that conflicts with an employment requirement; (2) he has informed the employer about the conflicts; and (3) he was discharged or disciplined for failing to comply with the conflicting employment requirement. *Virts v. Consolidated Freightways Corp. of Delaware*, 285 F.3d 508 (6th Cir. 2002) (citations omitted).

With respect to the first element of his prima facie case, Plaintiff points to conflicts that allegedly arose while Ms. Zinser was Chair. Mr. Yedes states that former Chair Zinser allegedly attempted to schedule classes for Plaintiff on Friday afternoon that would interfere with his ability to prepare for his sermon and prepare "spiritually".  The evidence before the Court does not show any instance in which Plaintiff was forced to miss a Friday religious event because of a Friday class or other work requirement.  Further, Mr. Yedes testified at deposition that he never complained to Oberlin concerning allegations of discrimination by Ms. Zinser. (Yedes Dep. 261-62). As such Plaintiff fails to show the first element of his prima facie case.

In addition, Plaintiff fails to demonstrate the third element of his prima facie case–that an adverse employment action was taken against him. For the purposes of his religious discrimination disparate treatment claim Plaintiff asserts that his adverse employment action is

17

the complaint that Mr. Senior filed against him with the PCRC after Plaintiff complained about the discrimination he was experiencing. Plaintiff implies that the complaint was filed shortly after Mr. Senior allegedly told Plaintiff that he should move his prayers to Saturday or Sunday. Mr. Senior's alleged suggestion to move his sermon to Saturday or Sunday occurred in late 2007 or early 2008 (ECF #18-1 at 29) and there is no temporal or causal connection between the alleged suggestion and Mr. Senior's filing of his complaint against Mr. Yedes more than a year later on May 13, 2009. Moreover, the filing of a complaint against a coworker is not an adverse employment action by the employer. The purpose of the complaint was for a worker to express his grievance with another worker. Plaintiff could have filed a complaint against Mr. Senior. Until the employer finds that the complaint has merit and does something to discipline the employee at issue, that employee has suffered no adverse employment action. Indeed, in this instance Oberlin determined that the Mr. Senior's complaint had no merit and Mr. Yedes was not disciplined in any way.

Plaintiff also refers to an incident at a departmental meeting where Mr. Senior asked him why he had not come to a film at the Francophone house. Plaintiff states that he was forced to explain again that the film, apparently shown on a Friday, conflicted with Plaintiff's prayer schedule and Friday religious obligations. This incident, while possibly annoying to Plaintiff, is not an adverse employment action. Plaintiff does not contend that he was disciplined in any way for failing to attend the film or that attending the film was a requirement of his job. Accordingly, Plaintiff has failed to demonstrate at least two of the elements of his prima facie case for religious discrimination and Defendant is entitled to summary judgment on Plaintiff's disparate treatment claims of religious discrimination in addition to race and national origin

discrimination.

**D. Hostile Work Environment Claim**

Oberlin asserts that even if Plaintiff's hostile work environment is not time barred, it fails

under a substantive analysis as well. In order to demonstrate a prima facie case of hostile work

environment race, national origin or religious discrimination under Title VII,  plaintiff must

prove the following:

> (1) they are members of a protected class; (2) they were
> subjected to unwelcomed racial [national origin, religious]
> harassment; (3) the harassment was based on their race
> [national origin or religion]; (4) the harassment
> unreasonably interfered with their work performance and
> created a hostile work environment; and (5) the employer
> 'knew or should have known of the charged racial [national
> origin or religious] harassment and failed to implement
> prompt and appropriate corrective action.'

*See Blankenship v. Park Care Ctrs., Inc.*, 123 F.3d 868, 873 (6th Cir. 1997)(citation omitted).

Moreover, to create a cognizable claim of hostile work environment racial, national

origin or religous harassment, the alleged harassing actions must be sufficiently severe or

pervasive to alter the conditions of the plaintiff's employment and create an abusive working

environment.  *See Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 752, 118 S. Ct. 2257,

2264 (1998); *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986).  Furthermore, the

objectionable environment must be both objectively and subjectively offensive: one that a

reasonable person would find hostile or abusive and one that the Plaintiff did, in fact, perceive to

be hostile or abusive.  *Faragher v. Boca Raton*, 524 U.S. 775, 788-89, 118 S.Ct. 2275, 2283

(1998) *citing Harris v. Forklift Systems, Inc*., 510 U.S. 17, 21 (1993).  The hostile work

environment must be determined by looking at the totality of the circumstances, including the

19

following: the frequency of the conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and, whether it unreasonably interferes with an employee's work performance.  *Harris, supra* at 23.

Oberlin's motion focuses on the requirement that the alleged hostile work environment must be objectively offensive in addition to subjectively offensive.  That is, Oberlin argues that a reasonable person would not find the environment complained of by Plaintiff hostile or abusive. Specifically, Oberlin contends that the totality of Mr. Senior's alleged behavior does not rise to the "severe and pervasive" level required for a hostile work environment claim under Title VII.

In his deposition, Mr. Yedes stated that several people discriminated against him including Dean Harry Hirsh, Professor Ben Schiff, Professor Libby Murphy, Professor Grace An, Instructor Loic Thommeret, Professor Janice Zinser, and Professor Matthew Senior. Except for Dean Hirsh and Professor Schiff, the people named are the other current or former members of the French Department. In his Complaint and in his opposition brief, Plaintiff focuses on the statements allegedly made by Mr. Senior to demonstrate the existence of a hostile work environment. The offending remarks, both in the Complaint and in Plaintiff's brief are:

   * I would not persecute you like this if you were American'

   * Oh, you are a Holy man, what do you say, what do you say, in your preaching?;

   * So, you are a Holy man, what do you do when you lead the prayer?;

   * I was hired to protect Grace and Libby from you;

   * You are a terrorist;

   * I've been hired to protect all the female employees from you;

   * I know how to deal with you North Africans;

* Your religion is your business and you should change your Friday prayer to Saturday or Sunday;

*   Who is your prophet: Is Muhammad or Ali?

Plaintiff also asserts that Mr. Senior made disparaging comments about him to other people.  Plaintiff contends that Mr. Senior expressed surprise to Professor Thomas that Mr. Yedes can "write a letter in Arabic."  Mr. Yedes also claims that Mr. Senior told Loic Thommert "I have some hard time dealing with French, let alone those Francophone people, I can't stand them."  Plaintiff also notes that Libby Murphy and Mr. Senior stated "each time you [Mr. Yedes] mention Arabic we are appalled."

Of the first seven statements that were set forth in the Complaint, Plaintiff testified at deposition that Mr. Senior made five of the statements once over the course of three years. (Yedes Dep. 349-52) The statements that "I've been hired to protect Grace and Libby from you" and "I've been hired to protect all women from you were allegedly made several times during that time period." Id.  These last two statements on their face do not implicate any racial, national origin or religious bias. While Oberlin claims that some of these statements are not offensive and that the others constitute nothing more than isolated offensive utterances at the worst, Plaintiff also complains that the hostile environment included excluding him from French Department meetings and events, removal from the email distribution list and similar cuts to exclude him from the Department. Visiting Professor Thomas, a Middle-Eastern immigrant, sat in on some of the French Department meetings and found them tension filled and noted a difference in attitude that Mr. Senior showed toward Ms. Murphy and Ms. An and that shown to the Plaintiff and herself. "He talks nicely, with a big smile, to Libby and Grace, but different to –

21

with us." (Thomas Dep. 51) She stated that Mr. Senior never made any offensive or discriminatory remarks to Plaintiff at the meetings she attended. She noted the refusal of the others to sit next to Plaintiff. (Thomas 51-52).

Plaintiff contends that these statements and actions combined to make a workplace permeated with "discriminatory intimidation, ridicule, and insult," that is "sufficiently severe or pervasive" to alter the conditions of his employment and create an abusive working environment. *Harris*, 510 U.S. at 21. Plaintiff states that as a result of this environment, he is unhappy and stressed, cannot sleep and feels like a failure.  He asserts that he has been unable to produce academically, and has not been able to write papers and produce books as a scholar because the discrimination has taken such an emotional toll. This has hurt his finances, ability to get promoted and potential publishing.

These alleged statements and the alleged conduct within the French Department, if true, raise a jury question about whether an objective person would find the behavior sufficiently severe and pervasive to create an abusive working environment. Plaintiff has raised genuine issues of material fact regarding the first four elements of the prima facie test for his hostile work environment claim.  The only remaining element is whether Oberlin 'knew or should have known of the charged racial [national origin or religious] harassment and failed to implement prompt and appropriate corrective action.' *Blankenship*, 123 F.3d at 873.

Oberlin contends that it is not "automatically liable" because Mr. Senior is allegedly Plaintiff's supervisor because Oberlin asserts that Mr. Senior was not Plaintiff's supervisor as contemplated by Title VII law. However, at this point Plaintiff need only demonstrate that Oberlin knew about the alleged harassment and failed to implement prompt and appropriate

22

corrective action. *See Blankenship, supra*, 123 F.3d at 873. Plaintiff contends that he complained to Mr. Senior and Dean Decatur about the ongoing problems in the French Department. Plaintiff claims that the problems were the result of Mr. Senior's discriminatory conduct and attitude. Defendants believe that Mr. Yedes is predisposed to find a discriminatory motive behind every action. It is clear from the report issued by the PCRC that Mr. Yedes complained of racism, a serious charge that the Committee felt should be addressed. It is clear, then, that Oberlin had notice of Plaintiff's allegations of discriminatory conduct. The record reflects that no specific investigation of the alleged discrimination was undertaken by Oberlin. Accordingly, Plaintiff has demonstrated a prima facie case for hostile work environment discrimination under Title VII and Oberlin's Motion for Summary Judgment on this claim is denied.

**E. Title VII Retaliation**

Title VII forbids retaliation by employers against employees who report workplace discrimination. *Crawford v. Metro. Govt. Of Nashville & Davidson Cty.Tenn*., 555 U.S. 271, (2009).  To establish a prima facie case of retaliation under Title VII, Plaintiff must demonstrate the following: (1) he engaged in protected activity; (2) defendant had knowledge that Plaintiff engaged in protected activity; (3) defendant thereafter took an adverse employment action; and (4) there is a causal connection between the protected activity and the adverse employment action. *Alexander v. Ohio State Univ. Coll. Of Soc. Work*, 429 Fed. Appx. 481, 488-89 (6th Cir. 2011); *Canitia v. Yellow Freight Sys. Inc*., 903 F.2d 1064, 1066 (6th Cir. 1990).

Plaintiff engaged in protected activity when he sent an email to Dean Decatur on March 4, 2009, complaining about Mr. Senior's conduct. (Yedes Dep. 99) Oberlin knew about this protected activity.  However, Plaintiff states that the adverse employment actions taken against

him were the "late" tenure decision and the failure to elevate him to Chair in 2007.  He also

states that Mr. Senior's complaint to the PCRC was an adverse employment action.  It is clear

that alleged adverse employment actions taken before Plaintiff engaged in protected activity are

not causally related to the protected activity.  Further, Mr. Senior's filing of a complaint with the

PCRC is not an action taken by his employer and is not in itself an adverse employment action.

Further, Plaintiff did not suffer any adverse employment action as a result of that complaint.

Accordingly, Plaintiff has failed to demonstrate a prima facie case of retaliation under Title VII

and Defendants' Motion for Summary Judgment on that claim is granted.

**F. State Claim of Intentional Infliction of Emotional Distress ("IIED")**

The Supreme Court of Ohio, in *Yeager v. Local Union 20,* 6 Ohio St. 3d 369, 374 (1983)

(abrogated on other grounds), set forth the elements of IIED.  "One who by extreme and

outrageous conduct intentionally or recklessly causes severe emotional distress to another is

subject to liability for such emotional distress. ..." *Id*. at 374.  Emotional distress is severe if "a

reasonable person, normally constituted, would be unable to cope adequately with the mental

distress engendered by the circumstances of the case."  *Paugh v. Hanks*, 6 Ohio St. 3d 72, 78

(1983).  Examples of serious emotional distress "include traumatically induced neurosis,

psychosis, chronic depression, or phobia." *Id.*  Thus, courts only permit liability for IIED where

"the conduct has been so outrageous in character and so extreme in degree, as to go beyond all

possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized

community." *Yeager*, 6 Ohio St. 3d at 375. In this case, Plaintiff asserts that the same "wrongful

conduct" asserted in his Title VII claims resulted in intentional infliction of emotional distress to

Plaintiff. (Complaint, ¶34).

24

Reviewing all of the allegations that Plaintiff has made against Mr. Senior and Oberlin, none of the alleged conduct can be objectively classified as extreme and outrageous and undertaken with the intent of causing Plaintiff severe emotional distress.  Plaintiff states that Mr. Senior failed to accommodate his Friday prayer schedule and asked him to schedule his prayer on Saturday or Sunday.  While asking Plaintiff to move his prayers was offensive to Plaintiff, there is no evidence that Mr. Senior demanded such a move or failed to accommodate Plaintiff's Friday religious activities. Plaintiff also points to Mr. Senior's filing of the PCRC complaint as inflicting emotional distress.  Again, while Plaintiff may have been distressed about the complaint, it was within Mr. Senior's rights as an Oberlin employee to make such a complaint. It cannot constitute outrageous conduct. Finally, Plaintiff contends that the statements allegedly made by Mr. Senior constitute extreme and outrageous conduct. Those, comments if true, are certainly inappropriate in a workplace. However, a few comments over a period of three years does not constitute conduct "so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Yeager*, 6 Ohio St. 3d at 375. Generally speaking, "discrimination, by itself, is insufficient to support an intentional infliction of emotional distress claim." *Fuelling v. New Vision Medical Laboratories LLC*, 284 Fed Appx. 247, 261, 2008 WL 2604280, 13 (6th Cir. June 27, 2008).  Accordingly, Defendants' Motion for Summary Judgment on Plaintiff's IIED claim is granted.

**G. State Negligent Retention and Supervision Claims**

Oberlin asserts that Plaintiff's negligent retention and supervision claims fail as a matter of law because the Sixth Circuit requires that a Plaintiff be able to allege and prove a tort claim

against the individual employee in order to prevail on a claim for negligent retention and supervision. *Minnich v. Copper Farms, Inc*., 39 Fed. Appx. 289, 295 (6th Cir. 2002); *Hout v. City of Mansfield*, 550 F.Supp.2d 701, 745-46 (N.D. Ohio 2008); *Myers v. Goodwill Indus. of Akron, Inc.,*130 Ohio App.3d 722, 721 N.E.2d 130, 134 (Ohio Ct.App.1998) (negligent retention claim against employer failed where plaintiff could not show that the employee's conduct rose to the level of intentional infliction of emotional distress).

In this case all of the claims against Mr. Senior (IIED) have been dismissed. As such, under the Sixth Circuit and Ohio law, Plaintiff cannot state a claim for negligent retention and supervision against Oberlin. Accordingly, Defendants' Motion for Summary Judgment on these claims is granted.

**CONCLUSION**

For the reasons set forth above, Defendants' Motion for Summary Judgment is granted as to all claims except Plaintiff's claim of hostile work environment discrimination in violation of Title VII against Defendant Oberlin.  All claims against Defendant Senior are dismissed. Trial remains May 7, 2012 at 8:30 a.m. IT IS SO ORDERED.


_/s/Donald C. Nugent_____
DONALD C. NUGENT
UNITED STATES DISTRICT JUDGE

DATED:_ March 23, 2012____

26